**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 20-1052 (SHL) |
| Plaintiff, | |
| v. | |
| MIHIR BHANSALI and AJAY GANDHI, | |
| Defendants. | |

**TRUSTEE'S OPPOSITION TO DEFENDANT AJAY GANDHI'S**
**MOTION TO DISMISS THE ADVERSARY COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

SUMMARY OF ALLEGATIONS ............................................................................................ 2

I.      The Bank Stage. ............................................................................................................ 2

II.     The Funnel Stage. ......................................................................................................... 3

III.    The Exit Stage. .............................................................................................................. 6

APPLICABLE STANDARDS.................................................................................................... 7

I.      Rule 12(b)(6) Standard................................................................................................. 7

II.     Rule 9(b) Standard. ...................................................................................................... 8

ARGUMENT............................................................................................................................... 9

I.      The Complaint Adequately States Claims for the Avoidance and Recovery of the
        Gandhi Transfers.......................................................................................................... 9

        A.      The Complaint Pleads the Factual Circumstances of the Gandhi Transfers
                with Particularity. ........................................................................................... 10

        B.      The Complaint Plausibly Alleges the Debtors' Actual Intent to Make the
                Gandhi Transfers to Hinder, Delay, or Defraud the Debtors' Creditors. .............. 11

                i.      Requirements for Pleading Actual Fraudulent Intent. ................................ 12

                ii.     The Complaint Meets the Pleading Standards for Actual
                        Fraudulent Intent. ......................................................................... 13

II.     The Complaint Plausibly Alleges that Gandhi was a Faithless Servant. ............................ 22

        A.      The Faithless Servant Claim Should Not Be Dismissed Because the
                Trustee States a Claim That Gandhi Acted as a Faithless Servant.......................... 22

        B.      The In Pari Delicto Doctrine Does Not Apply to the Faithless Servant
                Claim.................................................................................................................. 25

III.    The Complaint Should Not Be Dismissed As Duplicative or on Claim Splitting
        Grounds......................................................................................................................... 27

CONCLUSION ........................................................................................................................... 32

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AmBase Corp. v. City Investing Co. Liq. Tr.*,
    326 F.3d 63 (2d Cir. 2003)..................................................................................................30

*Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*,
    2019 WL 6498094 (S.D.N.Y. Dec. 3, 2019) ........................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................7

*Berk v. Tradewell, Inc.*,
    2003 WL 21664679 (S.D.N.Y. July 16, 2003) ..................................................................8, 9

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
    2011 WL 3847376 (S.D.N.Y. Aug. 30, 2011)......................................................................28

*Bravin v. Fashion Week, Inc.*,
    342 N.Y.S.2d 971 (1973).....................................................................................................23

*Brown v. Poritzky,*
    30 N.Y.2d 289 (1972) ..........................................................................................................24

*Coleman v. B.G. Sulzle, Inc.*,
    402 F. Supp. 2d 403 (N.D.N.Y. 2005) .................................................................................31

*Curtis v. Citibank, N.A.*,
    226 F.3d 133 (2d Cir. 2000).............................................................................................28, 31

*Davis v. Norwalk Econ. Opportunity Now, Inc.*,
    534 F. App'x 47 (2d Cir. 2013) ...........................................................................................30

*Devlin v. Trans. Comm'cns Int'l Union*,
    175 F.3d 121 (2d Cir. 1999).................................................................................................31

*DiGennaro v. Whitehair*,
    467 F. App'x 42 (2d Cir. 2012) ...........................................................................................30

*DiGennaro v. Whitehair*,
    2010 WL 4116741 (W.D.N.Y. Oct. 19, 2010) ....................................................................30

*Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)................................................................................8

*Global Crossing Estate Representative v. Winnick*,
    2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006)......................................................25

*In re 45 John Lofts, LLC*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019).....................................................10, 13, 18

*In re Bennett Funding Group, Inc.*,
    367 B.R. 269 (Bankr. N.D.N.Y. 2007) ...............................................................8, 9

*In re Bernard L. Madoff Inv. Sec. LLC*,
    445 B.R. 206 (Bankr. S.D.N.Y. 2011).....................................................10, 11, 18

*In re Candor Diamond Corp.*,
    76 B.R. 342 (Bankr. S.D.N.Y. 1987)..................................................................21

*In re Cassandra Grp.*,
    338 B.R. 583 (Bankr. S.D.N.Y. 2006)................................................................19

*In re Cohoes Indus. Terminal*,
    69 B.R. 717 (Bankr. S.D.N.Y. 1987)..................................................................29

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)............................................................20, 21

*In re Everfresh Beverages, Inc.*,
    238 B.R. 558 (Bankr. S.D.N.Y. 1999)................................................................11

*In re Fairfield Sentry Ltd.*,
    596 B.R. 275 (Bankr. S.D.N.Y. 2018)...........................................................28, 30

*In re Kaiser*,
    722 F.2d 1574 (2d Cir. 1983)........................................................................10, 19

*In re KDI Holdings, Inc.*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999)................................................................25

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012)................................................................19

*In re Lehman Bros. Holdings Inc.*,
    541 B.R. 551 (S.D.N.Y. 2015)...........................................................................13

*In re Lehr Construction Corp.*,
    528 B.R. 598 (Bankr. S.D.N.Y. 2015), *aff'd* 666 Fed. Appx. 66 (2d Cir. 2016)...............22, 25

*In re Lyondell Chem. Co.*,
    554 B.R. 635 (S.D.N.Y. 2016)..............................................................12, 13, 15, 19

*In re Millennium Lab Holdings II, LLC*,
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ......................................... passim

*In re Musicland Holding Corp.*,
    398 B.R. 761 (Bankr. S.D.N.Y. 2008) ...................................................................18

*In re Platinum-Beechwood Litig.*,
    2019 WL 2569653 (S.D.N.Y. June 21, 2019) .......................................................25

*In re Saba Enterprises, Inc.*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009)....................................................................10

*In re Smith*,
    204 B.R. 358 (Bankr. E.D.N.Y. 1997)...................................................................27

*In re Syntax-Brillian Corp.*,
    2016 WL 1165634 ...........................................................................16, 18, 19, 20

*In re Tronox Inc.*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010).........................................................10, 18, 19

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013)............................................................12, 15

*In re Welspun Litig.*,
    2019 WL 2174089 (S.D.N.Y. May 20, 2019) ........................................................8

*Interoceanica Corp. v. Sound Pilots, Inc.*,
    107 F.3d 86 (2d Cir. 1997)...................................................................................28

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
    8 F.3d 130 (2d Cir.1993).................................................................................25, 26

*Leary v. Al-Mubaraki*,
    2019 WL 4805849 (S.D.N.Y. 2019)......................................................................23

*Limas LS PLC v. PHL Variable Insurance Co.*,
    2013 WL 12286066 (D. Conn. Dec. 17, 2013).........................................................9

*Maharaj v. Bankamerica Corp.*,
    128 F.3d 94 (2d Cir. 1997)..............................................................................28, 30

*McNellis v. First Fed. Sav. & Loan Ass'n of Rochester, N.Y.*,
    364 F.2d 251 (2d Cir. 1966).................................................................................28

*Nestor v. Pratt & Whitney*,
    466 F.3d 65 (2d Cir. 2006)...............................................................................28

*Phansalker v. Andersen Weinroth & Co., L.P.*,
    344 F.3d 184 (2d Cir. 2003)........................................................................22, 23

*Picard v. Estate of Mendelow (In re Bernard L. Madoff Inv. Sec. LLC)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016).............................................................27

*Reininger v. N.Y.C. Transit Auth.*,
    2016 WL 10566629 (S.D.N.Y. Dec. 22, 2016) ...............................................30

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013).................................................................................8

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...........................................................................28

*Sacerdote v. Cammack Larhette Advisors, LLC*,
    939 F.3d 498 (2d Cir. 2019).......................................................................28, 30

*Schmieder v. Hall*,
    545 F.2d 768 (2d Cir. 1976).............................................................................30

*Sec. & Exch. Comm'n v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017)..............................................................28

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999)........................................................12, 18

*Shamrock Assocs. v. Sloane*,
    738 F. Supp. 109 (S.D.N.Y. 1990) ...................................................................28

*Sterling v. Deutsche Bank Nat'l Tr. Co. as Tr. for Femit Tr. 2006-FF6*,
    2019 WL 5722320 (S.D.N.Y. Aug. 16, 2019) ..................................................28

*Sullivan v. Kodsi*,
    373 F.Supp.2d 302 (S.D.N.Y. 2005)...................................................................8

*Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*,
    873 F.Supp. 765 (E.D.N.Y. 1995) ......................................................................9

*Waldman v. Village of Kiryas Joel*,
    207 F.3d 105 (2d Cir. 2000)..............................................................................30

**STATUTES & RULES**

11 U.S.C. § 548(a)(1)(A) ....................................................................................................10

11 U.S.C. § 548(c) .............................................................................................................. 21

Fed. R. Civ. P. 9(b) ....................................................................................................8, 9, 11, 12

Fed. R. Civ. P. 12(b)(6)...........................................................................................................8

Fed. R. Civ. P. 15..................................................................................................................27

Fed. R. Civ. P. 42(a)(2)..........................................................................................................31

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**") for

Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively,

the "**Debtors**"),[1] in opposition to Defendant Ajay Gandhi's Motion to Dismiss [Adv. Dkt. 9] (the

"**Motion**" or "**MTD**") the Trustee's Complaint [Adv. Dkt. 1] (the "**Complaint**"), respectfully

states as follows:

## INTRODUCTION

The Debtors paid Ajay Gandhi a salary in exchange for his participation in the multi-year,

multi-billion dollar fraud scheme (the "**Bank Fraud**") that destroyed the Debtors' legitimate

businesses, impaired the claims of the Debtors' creditors, and caused the Debtors to file for

bankruptcy and terminate all of their employees. Because the Debtors' payments to Gandhi (the

"**Gandhi Transfers**") were inextricably bound to the Bank Fraud, they were fraudulent from the

start and voidable. The Trustee seeks to recover the Gandhi Transfers for the benefit of the

Debtors' estates on actual fraudulent transfer and faithless servant theories.[2]

Gandhi moves to dismiss the Complaint on the grounds that it fails to plead with

particularity the Debtors' actual fraudulent intent in making the Gandhi Transfers, that it does

not state a faithless servant claim because Nirav Modi tolerated Gandhi's fraudulent conduct and

the harm it caused to the Debtors, and that the Trustee should have brought the actual fraudulent

transfer and faithless servant claims in the Trustee's prior adversary proceeding that alleges that

Gandhi, among others, breached his fiduciary duties of care and loyalty to the Debtors (the

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed to them in the Complaint. Additionally, with respect to allegations made on information and belief in the Complaint, the Trustee will treat such allegations as true for the purposes of this Opposition. However, nothing in this Opposition should be construed as negating or limiting such qualifications in the Complaint.

[2] The Gandhi Transfers are listed in full on <u>Schedule B</u> to the Complaint, which shows the date of each transfer, the Debtor-transferor, the property transferred, the value of the transfer, and the transferee (Gandhi).

1

"**Fiduciary Duty Action**"). Taking the Complaint's allegations as true and construed in the light most favorable to the Trustee, it sufficiently alleges the Debtors' actual intent to hinder, delay, or defraud creditors in making the Gandhi Transfers. The Complaint also sufficiently alleges a faithless servant claim, because the relevant focus of the analysis is the employer (*i.e.*, the Debtors), not any controlling shareholders, *de facto* officers, or alter egos (*i.e.*, Modi). Finally, under governing Second Circuit law, the claims asserted in the Complaint differ from those in the Fiduciary Duty Action and are not improperly split from that Action, and this litigation does not constitute an improper amendment of the fiduciary duty complaint without leave of the Court.

Therefore, the Complaint alleges plausible claims for the avoidance and recovery of the Gandhi Transfers as actually fraudulent and, in the alternative, for the disgorgement and recovery of the Gandhi Transfers under the faithless servant doctrine, and the Motion should be denied.

SUMMARY OF ALLEGATIONS

The genesis of this Complaint, as with so much else in these chapter 11 cases, is the Bank Fraud that Gandhi, Modi, Mihir Bhansali, and their co-conspirators conceived and implemented. The Debtors paid Gandhi for his continued participation in the Bank Fraud. Gandhi, Modi, and Bhansali ultimately benefitted personally from their fraudulent conduct, despite its calamitous effects on the Debtors, their estates, and their creditors. The Bank Fraud involved three overlapping stages.

**I.      The Bank Stage.**

The first stage (the "**Bank Stage**") involved fraudulently inducing Punjab National Bank ("**PNB**") and other banks to extend credit on the basis of circular import and export transactions between LOU Entities and Shadow Entities. (*See generally* Complaint ¶¶ 20-32.) Precious gems, metals, and jewelry were transferred in a "loop" between LOU Entities and Shadow Entities as

2

part of the Bank Stage to fraudulently inflate the LOU Entities' import volume and increase their

LOU funding. (*Id.* ¶ 30.) The Bank Stage began no later than 2010 when Modi and his co-

conspirators fraudulently solicited issuance of the first bank loan (*id.* ¶ 20) and stopped in late

January 2018 when the Bank Fraud  was exposed (*id.* ¶¶ 33-39).

The Complaint alleges that Gandhi knew of and participated in the Bank Stage. For

example, on February 6, 2013, Gandhi emailed Modi, copying Bhansali, "Niravbhai, After

keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I

should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." Gandhi also emailed

Manish Bosamiya, Miten Pandya, and Amit Magia: "We can pay $1.0 million to India in the

month of February 2013. Please email me a list to pay." Manish Bosamiya and Miten Pandya were

among the individuals directly involved in obtaining LOU funding from PNB. Thus, the purpose

of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be

able to send to facilitate repayment of LOUs, directly implicating Gandhi in the Bank Scheme. (*Id.*

App. A-76(xi).) Similarly, in February 2014, Gandhi corresponded with Bosamiya again about

using the Debtors' funds—$4 million this time—to repay outstanding LOUs. (*Id.* App. A-76(xvii).)

As a final, non-exhaustive example, in 2011, the Debtors were the "exporters under and direct

beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303," of which Gandhi

should have been aware in his role as the Debtors' CFO. (*Id.* ¶ 43; *see also id.* 44-51.)

## II.     The Funnel Stage.

The second stage (the "**Funnel Stage**") involved fraudulent transactions disguised as

sales, loans, and equity investments among Shadow Entities and Firestar Entities (including the

Debtors) designed to funnel cash and inventory into and out of the "loop" comprising the Bank

Stage. (*See generally id.* ¶¶ 29-32.) Whereas the Bank Stage was based on circular transactions

between LOU Entities and Shadow Entities, the Funnel Stage was based on circular transactions

among Shadow Entities and Firestar Entities. The Funnel Stage principally spanned from roughly

2013, when the Shadow Entities became the LOU Entities' exclusive trading partners (*id.* ¶¶ 26,

29, 46), to January 2018, when the Bank Fraud was exposed (*id.* ¶ 35).

The Complaint contains the following allegations, among many others, of Gandhi's

knowledge of and participation in the Funnel Stage:

- Gandhi, while CFO of each of the Debtors and U.S. Affiliates (*id.* ¶ 13), personally directed and approved fraudulent transfers of millions of dollars in cash and inventory from the Debtors and U.S. Affiliates to overseas Shadow Entities and Firestar Entities (*id.* ¶¶ 55-56, 76, 77, 83; *see also id.* App. A-76, App. A-77, A-83);

- Gandhi maintained two sets of books and records for Jaffe, one that included Shadow Entity transactions and one that did not (*id.* ¶ 79; *see also id.* App. A-83(ii)-(v));

- Gandhi oversaw and directed the use of sales and inventory practices for Shadow Entity transactions that differed from those used for legitimate retailer customers (*id.* ¶¶ 84-86);

- Gandhi consulted with Modi and Gandhi on how they should respond to auditor inquiries concerning Shadow Entity transactions (*id.* ¶¶ 87-97; *see also id.* App. A-97);

- During audits, Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to the Operation 1 email account to request that co-conspirators cause the relevant Shadow Entities to provide confirmation to the auditors (*id.* ¶ 96; *see also id.* App. A-96);

- Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' and the Debtors' regular email system (*id.* ¶ 66);

- Gandhi regularly emailed Modi, Miten Pandya, Amit Magia, Shyam Wadhwa, and others advising them of his ability to wire funds from the U.S. Entities to India to advance the Bank Fraud (*id.* ¶ 77; *see also id.* App. A-77);

- On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be [Shadow Entity] Pacific, World Diamond, etc

too." That same day, FDI transferred $1,000,000 to Shadow Entity Fancy Creations. This transaction is described as an "advance" in FDI's bank statement (*id.* App. A-76(i));

- On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012 (*id.* App. A-76(iii));

- On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, "Please find attached internal transfer as well as wire document for your reference. 1. FDI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to [Shadow Entity] Pacific, Amount $2,455,036.00 (Abu Dhabi Bank) (*id.* App. A-76(xv));

- On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million in April 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with instructions to wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL. On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014, Gandhi followed up, "$240k and $341k wired today" (*id.* App. A-77(vi));

- On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation (*id.* App. A-76(xxii));

- On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Shadow Entity Pacific. Doshi replied with the wire confirmation (*id.* App. A-76(xxxii));

- On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?" (*Id.* App. A-77(vii))

- On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)" (*id.* ¶ 69);

- On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017" (*id.* App. A-97(viii)); and,

- On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations (*id.* App. A-76(xliv)).

## III.    The Exit Stage.

The third stage (the "**Exit Stage**") constituted the conspirators' exit strategy and involved efforts to permanently shield assets from the victims of the Bank Fraud. The Exit Stage included: the systematic looting of the Debtors', U.S. Affiliates', and other Firestar Entities' assets in the months leading up to and following exposure of the Bank Stage (*id.* at ¶¶ 165-178); and the broader diversion of cash, real estate, and other assets for the benefit of the Modi, Bhansali, and Gandhi families (*id.* ¶¶ 98-135). Implementation of the Exit Stage began as early as April 2012 when Nirav Modi for no apparent consideration, gave his sister Purvi Mehta a $14,575,000 loan receivable owed to him by Synergies (which Synergies paid in full to Mehta in July 2017 (*id.* ¶ 119-120)) and continued through at least September 2018 when over $40 million of NMI and FDII inventory was taken from Malca Amit and shipped to overseas Modi-Controlled Entities (*id.* ¶ 168).

In addition to the allegations referenced in connection with the Bank Stage and Funnel Stage, the Complaint contains the following allegations, among others, of Gandhi's knowledge of and participation in the Exit Stage:

- The Debtors' bankruptcy schedules and statements of financial affairs, which Gandhi signed under penalty of perjury, failed to disclose millions of dollars in transfers by FDI to Shadow Entities which Gandhi personally directed or otherwise participated in, nor did Gandhi disclose the more than $11.2 million loan owed by NMI to Jaffe (*id.* ¶¶ 149-53);

- Prior to and after the Debtors' bankruptcy filing, Gandhi caused the Debtors to wire or otherwise transfer millions of dollars of the Debtors' cash or inventory to Modi-Controlled Entities overseas (*id.* ¶¶ 165-66);

- After the Debtors' bankruptcy filing, Gandhi caused NMI and FDII to ship substantially all of their more than $40 million inventory to Modi-Controlled Entities overseas (*id.* ¶¶ 166, 168, 171-78);

- Gandhi met with Angelina Ypma when she visited New York in 2018 and granted her permission to remove NMI inventory from storage at Malca Amit (*id.* ¶ 175);

- Gandhi communicated with Modi in the weeks following exposure of the Bank Scheme, including about the Debtors' bankruptcy and sale process. Gandhi forwarded emails to his own personal email address, which Modi was apparently using to communicate at that time (*id.* ¶¶ 137, 156);

- When interviewed by the Examiner, Gandhi lied about his knowledge of the Shadow Entities' connection to Nirav Modi, his knowledge of the loose diamond transactions with Shadow Entities, and whether he ever used his personal email address for the Debtors' business (*id.* ¶¶ 160-62);

- On April 23, 2018, Gandhi emailed the personal email address of a back office employee in India and requested the open accounts receivable and accounts payable between Jaffe and Shadow Entities Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. Gandhi referred to these parties as "overseas non-affiliates" (*id.* ¶ 75);

- In March 2017, Gandhi emailed Modi that HSBC requested more information on the ownership structure of CPRE "going up thru the ladder to FILP, India[,]" including the "Source of Wealth" of "Purvi Modi[.]" Gandhi relayed that he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way, we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that" (*id.* ¶ 112); and,

- In March 2018, Gandhi ran numerous internet searches on the Adelphia Communications fraud case and related bankruptcy, including "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?" (*id.* ¶ 138).

## APPLICABLE STANDARDS

### I.   Rule 12(b)(6) Standard.

The Court must deny a motion to dismiss where the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6), the Court must similarly "accept[] all allegations in the complaint as

true, and draw[] all reasonable inferences in plaintiffs' favor." *Rothstein v. UBS AG*, 708 F.3d 82,

90 (2d Cir. 2013). "Detailed factual allegations" are not required, *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 555), and factual disputes are not resolved on a motion to dismiss. *Financial*

*Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015) (affirming denial of

motion to dismiss and refusing to resolve factual disputes against non-movant).

## II.      Rule 9(b) Standard.

Rule 9(b) requires plaintiffs averring fraud to "state with particularity the circumstances

constituting fraud[.]" Fed. R. Civ. P. 9(b). But the rule "does not require factual pleadings that

demonstrate the *probability* of wrongdoing." *In re Welspun Litig.*, 2019 WL 2174089, at *15 (S.D.N.Y.

May 20, 2019) (citing *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d

Cir. 2015)) (emphasis in original). "At the pleadings stage, the alleged fraud need only be *plausible*

based on the complaint; it need not be more likely than other possibilities." *Id.* Moreover,

"[w]here facts are peculiarly within the opposing party's knowledge, as might be the case where

private, financial transfers are involved, a complaint may base allegations on information and

belief, provided that it 'adduce specific facts supporting a strong inference of fraud[.]'" *Sullivan*

*v. Kodsi*, 373 F.Supp.2d 302, 306 (S.D.N.Y. 2005) (quoting *Wexner v. First Manhattan Co.*, 209 F.2d

169, 172 (2d Cir. 1990)); *accord Berk v. Tradewell, Inc.*, 2003 WL 21664679, at *13 (S.D.N.Y. July 16,

2003)).

Indeed, "[g]reater liberality in the pleading of fraud is particularly appropriate in

bankruptcy cases, because it is often the trustee, a third party to the fraudulent transaction, that

must plead the fraud on secondhand knowledge for the benefit of the estate and all of its

creditors." *In re Bennett Funding Group, Inc.*, 367 B.R. 269, 297 (Bankr. N.D.N.Y. 2007) (quoting *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999)) (alterations and quotations marks omitted). This is especially true "when the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Id.* In that circumstance, "the trustee's handicap increases, and courts, therefore, should afford him or her even greater latitude." *Id.*

Finally, "Rule 9(b) is applied more leniently to complaints against corporate insiders." *Berk*, 2003 WL 2003 WL 21664679 at *13 (citing *Allen v. New World Coffee, Inc.*, 2001 WL 293683, at *4 (S.D.N.Y. Mar. 27, 2001)); *accord Limas LS PLC v. PHL Variable Insurance Co.*, 2013 WL 12286066, at *5 (D. Conn. Dec. 17, 2013); *Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 772 (E.D.N.Y. 1995). Under these standards, the Trustee's allegations are sufficient to withstand Gandhi's Motion.

## ARGUMENT

### I.   The Complaint Adequately States Claims for the Avoidance and Recovery of the Gandhi Transfers.

Gandhi argues that the Trustee failed to allege that the Debtors made the Gandhi Transfers with actual fraudulent intent to hinder, defraud, or delay their creditors. (MTD, at 8-11.) In making this argument, Gandhi cites to and discusses only the paragraphs in the Complaint calculating the total amount of the Gandhi Transfers and contends that the Trustee fails to allege "specifics" as to why the Gandhi Transfers were actually fraudulent. (MTD, at 10-11.). But the Trustee does allege "specifics." The Complaint contains over 180 paragraphs of factual allegations, as well as multiple appendices and schedules setting forth additional allegations, all of which systematically detail how the Debtors, Modi, and his co-conspirators engaged in the decade-long and multi-billion dollar Bank Fraud; how they made the Gandhi Transfers to secure

Gandhi's continued participation in the Bank Fraud; and how Gandhi did, in fact, take overt acts in furtherance of the Bank Fraud in exchange for his compensation from the Debtors. Even though Gandhi ignores these factual allegations, the Court may not. The Court must accept them as true in this procedural posture. And doing so compels the conclusion that the Trustee has stated a claim for the avoidance and recovery of the Gandhi Transfers.

**A.    The Complaint Pleads the Factual Circumstances of the Gandhi Transfers with Particularity.**

Under the Bankruptcy Code, "the trustee may avoid any transfer . . . of an interest of the debtor in property . . . made or incurred on or within 2 years before the date of the filing of the petition, if the debtor . . . made such transfer . . . with actual intent to hinder, delay or defraud." 11 U.S.C. § 548(a)(1)(A). The rule under New York state law is the same, although the lookback period is extended to six years. N.Y. D.C.L. § 276.

To state an actual fraudulent transfer claim, the Trustee must first plead with particularity the "factual circumstances" concerning the fraudulent transfers subject to avoidance. *In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011). These factual circumstances are: "(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer, and (3) the consideration paid with respect thereto." *In re 45 John Lofts, LLC*, 599 B.R. 730, 741 (Bankr. S.D.N.Y. 2019); *accord In re Kaiser*, 722 F.2d 1574, 1582-84 (2d Cir. 1983); *Madoff Inv. Sec. LLC*, 445 B.R. at 220-21; *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019) ("Allegations of 'date, place or time' fulfill the requirement to plead the circumstances constituting fraud or mistake with particularity"). By pleading these factual details, the Trustee "identifie[s] the allegedly fraudulent transfers with sufficient particularity such that [a defendant] has been apprised of the nature of its or his alleged participation [in fraudulent conduct] and, consequently, would be able to mount a defense with regard thereto."

*In re Saba Enterprises, Inc.*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009); *accord In re Tronox Inc.*, 429 B.R. 73, 92 (Bankr. S.D.N.Y. 2010).

The Trustee has met this requirement. Schedule B to the Complaint identifies the date of each Gandhi Transfer, the Debtor-transferor, the property transferred, the value of the transfer, and the transferee (Gandhi). (Complaint, Sched. B.) Listing each Gandhi Transfer in this way identifies the universe of transfers the Trustee seeks to avoid and "puts [Gandhi] on notice as to the claims against [him]," in satisfaction of Rule 9(b). *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 582 (Bankr. S.D.N.Y. 1999). Indeed, courts have recognized that attaching an exhibit like Schedule B to an avoidance complaint meets Rule 9(b)'s particularity requirement for actual fraudulent transfer claims. *See Madoff Inv. Sec. LLC*, 445 B.R. at 220 (denying motion to dismiss actual fraudulent transfer claims where "Exhibit B to the Complaint specifically identifies the date, account number, transferor, transferee, method of transfer, and amount of each of the Transfers . . . sought to be avoided in accordance with Rule 9(b)").

As a result, the Trustee has plausibly alleged the "factual circumstances" underlying the Gandhi Transfers. *Id.*

> **B.**    **The Complaint Plausibly Alleges the Debtors' Actual Intent to Make the Gandhi Transfers to Hinder, Delay, or Defraud the Debtors' Creditors.**

Gandhi contends that the actual fraudulent transfer claims must be dismissed because the Trustee "fails to allege any specifics, including the who, what, where, when or how FDI (and then FDII) intended to defraud its creditors by paying its employee a reasonable salary in consideration for services provided by him, and which were made in the ordinary course of business." (MTD, at 10; *see also id.* at 11.) This argument fails. The Trustee has sufficiently pled the Debtors' general intent to defraud creditors through the Bank Fraud, which necessarily required Gandhi's participation and continued employment at the Debtors, all in exchange for the Gandhi

Transfers. Even if the Debtors' general intent with respect to the Bank Fraud is insufficient, badges of fraud surround the Gandhi Transfers and plausibly show that the Debtors made the Gandhi Transfers with actual fraudulent intent. This conclusion easily follows when the Complaint's factual allegations are accepted as true and all reasonable inferences are drawn in the Trustee's favor, as the Court must do at this stage.

    *i.*  *Requirements for Pleading Actual Fraudulent Intent.*

For pleading fraudulent intent, Rule 9(b)'s particularity requirement does not apply: "'Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Anhui Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*, 2019 WL 6498094, at *4 (S.D.N.Y. Dec. 3, 2019). As a result, a complaint alleges facts sufficient to give rise to a strong inference of fraudulent intent by either (a) alleging facts showing that the defendant had "both motive and opportunity to commit fraud," or (b) alleging facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Stratton Oakmont*, 234 B.R. at 310.

As to the second prong, courts have made clear that "if the natural consequence of a debtor's action is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance." *Millennium Lab Holdings*, 2019 WL 1005657, at *3; *accord In re Lyondell Chem. Co.*, 554 B.R. 635, 650-51 n.17 (S.D.N.Y. 2016) (citing *In re Condon*, 198 F. 947, 950 (S.D.N.Y.1912)). This is so because "intent" is meant to "denote that the actor desires to cause consequences of his act" or "he believes that the consequences are substantially certain to result from it." *In re Tronox Inc.*, 503 B.R. 239, 279 (Bankr. S.D.N.Y. 2013). Accordingly, when it is substantially certain that allegedly fraudulent conduct will diminish a debtor's "minimal asset base" available to fund creditor "recover[ies] in the future," the "direct consequence" of such conduct is to "hinder[] or delay[]" creditors, establishing actual fraudulent intent. *Id.* at 280.

Finally, the intent of Modi, Gandhi, and Bhansali can be imputed to the Debtors for purposes of pleading the Debtors' actual fraudulent intent with respect to the Trustee's fraudulent transfer claims. A "corporation can act only through its agents." *Lyondell*, 554 B.R. at 648. Courts therefore "hold a corporation liable for the acts and knowledge of its agents even when the agent[s] act[] fraudulently or cause[] injury to third persons through illegal conduct." *Id.* at 647. Corporate officers and other individuals qualify as the corporation's agents, sufficient to trigger imputation, so long as they were "in a position to control the corporation's property" *45 John Lofts*, 599 B.R. at 740, or were otherwise "acting within the scope of their authority" at the time of their allegedly fraudulent conduct, *Lyondell*, 554 B.R. at 647; *accord In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 576 (S.D.N.Y. 2015).

       *ii.*      *The Complaint Meets the Pleading Standards for Actual Fraudulent Intent.*

Under these principles, the Trustee has plausibly alleged that the Debtors acted with actual fraudulent intent when they made the Gandhi Transfers. The Complaint is replete with instances where Gandhi participated in the Bank Fraud in the ordinary course of his duties as the CFO of the Debtors. The Debtors made the Gandhi Transfers in exchange for Gandhi's continued employment and participation in the Bank Fraud. The natural consequence of the Gandhi Transfers is that Gandhi would continue to conspire with Modi and others to commit the Bank Fraud, meaning the Debtors made the Gandhi Transfers with actual fraudulent intent.

To begin, the Complaint states that, "as CFO of each of the U.S. Entities [including the Debtors], and in coordination with or at the direction of Modi and Bhansali, Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-

Controlled Entities involving hundreds of millions of dollars in funds and diamonds. (Complaint, at ¶ 55.) "These transactions were integral to the Bank Fraud." (*Id.*) As an example:

> In a September 2015 email, Ajay Gandhi instructed one of his accounting employees to "Please wire $1,017,000 from Firestar Diamond, Inc to [Shadow Entity] Pacific Diamond – on account." The employee replied with the wire confirmation. Gandhi replied, please wire $54,000 to [Shadow Entity] Pacific D from Firestar Diamond, Inc." Gandhi then emailed the Operation 1 email account, which existed to coordinate fraudulent conduct through the Shadow Entities. Ghandi was replying to an email earlier that day in which Operation 1 sent bank details for Shadow Entity Pacific, and stated: "$1.017m wired. I thought it was $1.017m but I received $1.071m. Will wire balance tomorrow - $54k."

(Complaint, App. A-76(xxvi).) Similarly, in January 2018, Gandhi requested that his accounting staff wire $2,466,015 and $525,000 from the U.S. Entities to Shadow Entity Fancy Creations and instructed them to "let your vendors know of this payment and clear any AR from HK." (*Id.* App. A-76(xlv).) These circular transactions were the central component of the Bank Fraud, and Gandhi implemented them in the ordinary course of his duties as the Debtors' CFO.

Other examples of Gandhi's involvement in the Bank Fraud abound. The Complaint alleges that Gandhi was a "signatory on each of the U.S. Entities' bank accounts" whose "authorization was required to make transfers from the U.S. Entities' accounts," including transfers in furtherance of the Bank Fraud and even the Gandhi Transfers at issue here. (Complaint, at ¶ 56.) Indeed, Gandhi personally ordered his accounting staff to send millions upon millions of dollars from the Debtors and the U.S. Entities to the Shadow Entities, frequently in circular transactions. (*See id.* App. A-76; App. A-77; App. A-83.) Further, Gandhi controlled and maintained spreadsheets showing internal accounting data for the Shadow Entities, and those Shadow Entities existed solely to perpetrate the Bank Fraud. (*Id.* ¶ 67; *see also id.* ¶ 75.) As a final example, Gandhi "maintained two sets of books and records for Jaffe: 'core' financials, which did not include loose diamond transactions outside the normal course of Jaffe's business, and

14

'regular' financials, which reflected transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud." (*Id.* ¶ 79; *see also id.* App. A-83(ii).)

To say the Complaint does not allege Gandhi's involvement in the Bank Fraud is to blind oneself to the actual allegations contained in the Complaint. (*See* MTD, at 10.)  Due to Gandhi's extensive involvement in the Bank Fraud, the fraudulent actions he took while in a position of control over the Debtors cannot easily be disentangled, especially on a motion to dismiss, from any of his legitimate activities in the ordinary course of the Debtors' lawful business. What is clear, though, is that as long as the Debtors continued paying Gandhi, and as long as he remained as the Debtors' CFO with the ability to control the Debtors' property, he would continue contributing to the Bank Fraud, including by diverting the Debtors' assets for fraudulent purposes. Indeed, the allegations in the Complaint plead fraudulent activities by Gandhi stretching back to at least 2011 and extending through and after the Debtors' commencement of their chapter 11 cases. (*See, e.g.,* Complaint, at ¶¶ 58, 62-63, 66-67, 69, 75-81, 84-91, 93-94, 96, 110-13, 137-38, 149-51, 160, 165, 166, 169, 170-74, 175; *id.* App. A-76; *id.* App. A-77; *id.* App. A-83; *id.* App. A-96; *id.* App. A-97.) And Gandhi's conduct, knowledge, and intent is imputed to the Debtors given his role as the Debtors' CFO.

As a result, it was a "substantial certainty" that the payment of the Gandhi Transfers would ensure Gandhi's continued contributions to the Bank Fraud, prolong its operation, and delay its exposure, to the ultimate detriment of all of the Debtors' creditors and their estates. *Lyondell*, 554 B.R. at 651. "[C]reditors would inevitably be hindered, delayed, or defrauded" by the Gandhi Transfers, and so the Debtors made them with actual fraudulent intent. *Tronox*, 503 B.R. at 279.

Courts have refused to dismiss actual fraudulent transfer claims in factually similar cases, particularly where the debtor-transferor engaged in unlawful conduct when making the

challenged transfers. For instance, in *Millennium Lab,* a liquidating trustee sought to avoid as actually fraudulent a $35 million fee that the debtor paid to its lenders as part of a refinancing of $1.775 billion of the debtors' term loans. 2019 WL 1005657, at *1. The court concluded that the debtor agreed to the terms of the refinanced loans, including the fee, "with no regard for how the loan would be repaid." *Id.* Even though this finding might have been sufficient to establish actual fraudulent intent, the court also highlighted that the debtor's "entire business model was based on practices that violated the Stark Law and the Anti-Kickback Statute" and the "illegality of the business model meant that [the debtor's] revenues were overstated." *Id.* at *4. The Court then denied the defendants' motion to dismiss because "an actual intent to defraud can be inferred from the debtor's active participation in an illegal business," *id.* at *4 n.29, because the "natural consequence" of illegal activity is to "hinder, delay, or defraud" a debtor's legitimate creditors. *Id.* at *3; *see also In re Syntax-Brillian Corp.,* 2016 WL 1165634, at *5-6 (plaintiff plausibly stated a claim for actual fraud where insiders of the debtors incurred obligations of debtors to bank while they were generating "fake credit memos" and recording "fake" sales).

Same here. The Debtors' payment of the Gandhi Transfers in exchange for Gandhi's continued contributions to an illegal scheme (which has now spawned criminal prosecutions across the globe, including in India and the United Kingdom) leads to the inference that the Debtors made the Gandhi Transfers with actual fraudulent intent.

*Millennium Lab* is analogous for an additional reason. The court also found that the persons in control of the debtor there "were as focused on the improvement of their personal fortunes and those of their families as on the effect of the [alleged fraudulent transfer] on the company and its creditors." *Id.* at *4. They "siphon[ed]" most of the proceeds of the loan refinancing "away from [the debtor] and into [their] hands," which left the Debtor "unable to satisfy the claims asserted against it by the government and others." *Id.*

Again, this description of fraudulent conduct fits this case like a glove. The Complaint extensively alleges actions by Modi, Gandhi, and their co-conspirators to siphon proceeds of the Bank Fraud, including proceeds that were held by the Debtors, to themselves and their families, exclusively for their own personal benefit and without regard for the interests of the Debtors' creditors and other stakeholders. (*See generally* Complaint, at ¶¶ 50, 52-56, 98-144.) Regarding Gandhi, for example, the Complaint alleges that  Gandhi caused Debtor FDI to pay $2 million worth of the purchase price for a $5 million apartment that Modi then used as a personal residence for himself and his family (*id.* 110); Gandhi caused FDI to make monthly payments on the apartment's $3 million mortgage, amounting to least $850,000 in mortgage payments from 2011 to 2018 (*id.*); Gandhi informed Modi in March 2017 that HSBC was inquiring into the ultimate beneficial ownership of the entity that held title to this apartment (*i.e.*, Modi) and informed Modi that he "avoided giving [this] information" to the bank (*id.* ¶ 112); Gandhi caused FDI, Jaffe, and Fantasy to pay off the outstanding mortgage in its entirety in December 2017 as a means of stopping HSBC's inquiries regarding Modi, his family, his co-conspirators, and their wealth derived from the Bank Fraud (*id.* ¶ 113); and Gandhi conspired with Bhansali to divert substantial amounts of the Debtors' and the U.S. Entities' cash and inventory to overseas Modi-Controlled Entities in the weeks leading up to and following the Debtors' bankruptcy filing, putting these assets out of the reach of creditors and likely allowing their re-distribution to Modi, Bhansali, Gandhi, and their co-conspirators as they saw fit (*id.* ¶¶ 165-66, 168.).

These allegations plausibly indicate that Gandhi, Modi, and Bhansali, whose intent can be imputed to the Debtors, were as concerned with their own personal enrichment as they were with the effect that transferring the Debtors' assets would have on the Debtors' creditors. *See Millennium*, at *4. The potential for self-enrichment gave them motive to approve actual fraudulent transfers, including the Gandhi Transfers, that had the substantially certain

consequence of perpetuating the Bank Fraud and increasing the harm to the Debtors' creditors. And their control over the Debtors' property gave them an opportunity to act on that motive. By alleging motive and opportunity, the Trustee has plausibly alleged the Debtors' actual fraudulent intent with respect to the Gandhi Transfers. *See, e.g., Stratton Oakmont*, 234 B.R. at 310; *In re Musicland Holding Corp.*, 398 B.R. 761, 777 (Bankr. S.D.N.Y. 2008).

Gandhi responds by invoking the traditional badges of fraud analysis for actual fraudulent transfer claims and suggesting that the Trustee has not pled each and every badge of fraud on the facts of this case. (*See* MTD, at 11.) But where the plaintiff has alleged motive and opportunity to commit fraud, actual fraudulent intent is sufficiently pled, and the "court need not make a finding with respect to these badges." *Madoff Inv. Sec.*, 445 B.R. at 223 n.15; *accord 45 John Lofts*, 599 B.R. at 743-44. This is because the "badges of fraud [are] just one substitute for direct evidence" of fraudulent intent. *Millennium Lab*, 2019 WL 1005657, at *3. "While the badges of fraud provide a basic rubric, courts examine the totality of the circumstances to determine whether fraudulent intent exists." *Syntax-Brillian*, 2016 WL 1165634, at *5; *accord Tronox*, 429 B.R. at 94 ("the focus is not on whether Plaintiffs have pled badges of fraud, but rather, whether Plaintiffs have sufficiently alleged a knowing intent on the part of the defendant to damage creditors"). And here, the totality of the circumstances indicate that the Debtors made the Gandhi Transfers with actual fraudulent intent because they were designed to effect, as their natural consequence, Gandhi's continued participation in the Bank Fraud.

In addition, even if certain badges of fraud are absent in this case, Gandhi is wrong to suggest that their absence dooms the Trustee's claims. On this point, the Second Circuit's decision in *Kaiser* is instructive. The Second Circuit affirmed a finding that a debtor made actual fraudulent transfers even though he asserted that the trustee failed to prove the existence of two traditional badges of fraud. The Second Circuit rejected this argument: because "[f]raudulent acts are as

varied as the fish in the sea," the absence of certain badges of fraud is "insignificant" where the debtor "establish[ed] a scheme of intent to defraud creditors" and "the intent to defraud is obvious." *Kaiser*, 722 F.2d at 1582-83. As another court instructed, the "presence or absence of any single badge of fraud is not conclusive." *Syntax-Brillian*, 2016 WL 1165634, at *5. Instead, the "proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Id.*; *accord In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 447-49 (Bankr. S.D.N.Y. 2012); *Tronox*, 429 B.R. at 94-95; *In re Cassandra Grp.*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (finding actual fraudulent transfer where only one badge of fraud was present).

Applying these rules to the Complaint, it sufficiently alleges "the confluence of several" badges of fraud that "constitute[s] conclusive evidence of an actual intent to defraud." *Lyondell*, 554 B.R. at 653. The badges of fraud clearly pled here include: "a close relationship among the parties to the transaction," "the chronology of the events and transactions under inquiry," "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors," "whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred," and the secrecy involved in the allegedly fraudulent transactions. *Lehman*, 469 B.R. at 447.

Here, the Debtors made all of the Gandhi Transfers to an undisputed insider of the Debtors as a means of prolonging the Bank Fraud that had rendered the Debtors insolvent due to the ever-increasing liabilities arising out of the fraudulent LOU transactions. Moreover, the Debtors and Gandhi certainly kept the Bank Fraud secret, as well as the Debtors' compensation of Gandhi for his contributions to the Bank Fraud, up until the spectacular revelation in these chapter 11 cases in the spring of 2018 that the Debtors and Gandhi co-conspired with Modi and others to conduct the Bank Fraud. "The presence of th[ese] badge[s] of fraud, along with viewing

the [Gandhi Transactions] under the totality of the circumstances," permits "the Court to draw

the reasonable inference that the Debtors [made the Gandhi Transfers] with the actual intent to

delay, hinder, or defraud" their creditors. *Syntax-Brillian*, 2016 WL 1165634, at *6.

Finally, Gandhi argues the Gandhi Transfers were not fraudulent because they were made

"in consideration" of the services Gandhi provided to the Debtors. (MTD, at 10; *see also id.* at 11

n.4.) But "a conveyance made with the intent to hinder, delay or defraud creditors is fraudulent

regardless of the consideration exchanged." *In re Dreier LLP*, 452 B.R. 391, 435 n.39 (Bankr.

S.D.N.Y. 2011). Under the totality of the circumstances, the Debtors made the Gandhi Transfers

with actual fraudulent intent in furtherance of the Bank Fraud. Because the Trustee brings only

actual fraudulent transfer claims, and not constructive fraudulent transfer claims, the question of

whether the Gandhi Transfers were made for adequate consideration is ultimately irrelevant.

Even then, it is plausible that the Debtors ultimately made the Gandhi Transfers without

consideration. Considering that Gandhi's activity in the Bank Fraud caused the Debtors' liabilities

to balloon and led to their insolvency, it appears that the Debtors received no benefit from

Gandhi's continued employment, secured by the Gandhi Transfers, that was outweighed by the

material harm he caused to the Debtors. As alleged in the Complaint, then, the Gandhi Transfers

were not made for consideration, and Gandhi cannot contest that factual allegation through his

motion to dismiss. This fortifies the conclusion that the Debtors made the Gandhi Transfers with

actual fraudulent intent, as shown by the totality of the circumstances and the traditional badges

of fraud.

Gandhi makes one more argument that merits a response. Gandhi contends that the

Gandhi Transfers were made in the "ordinary course of business," which purportedly shows that

they were not made with actual fraudulent intent. (MTD, at 10; *see also id.* at 11.) This argument

does not undermine the Trustee's general allegations as to the Debtors' actual fraudulent intent,

which must be accepted as true at this stage in the litigation. If anything, it goes to Gandhi's defense under section 548(c), which provides that a trustee cannot avoid an allegedly fraudulent transfer that was made "for value and in good faith." 11 U.S.C. § 548(c).[3] Gandhi will be able to attempt to prove, later in this litigation, that he did not conduct any activities in furtherance of the Bank Fraud during periods of time linked to specific biweekly payments or specific bonus/severance payments. But at this stage, all of the Trustee's factual allegations must be accepted, all reasonable inferences must be drawn in the Trustee's favor, and the Trustee's burden must be relaxed given that he is an outsider to the fraudulent scheme alleged in the Complaint. Under the standards applicable to a motion to dismiss, the Trustee has sufficiently pled that each Gandhi Transfer was bound to Gandhi's participation in the Bank Fraud and therefore actually fraudulent. *See Dreier LLP*, 452 B.R. at 435 ("Whether the Defendants in this case took the transfers in good faith and for value are issues to be raised as affirmative defenses and 'need not be negated by the Trustee in the Complaint.'") (quoting *Stratton Oakmont*, 234 B.R. at 318).

Finally, the Trustee has only sought to recover the compensation paid to Gandhi and Bhansali as actual fraudulent transfers, and has not sought to avoid any other compensation provided to any other of the Debtors' employees. The Trustee narrowly calibrated his fraudulent transfer claims to pursue only payments made to individuals who controlled the Debtors and who *ran the Bank Fraud* that drove the Debtors into bankruptcy, impaired the claims of all of their creditors, and caused the destruction of millions of dollars in the Debtors' enterprise value. The fact that the Trustee did not seek recovery of the compensation to all of the Debtors' employees

---

[3] On the facts alleged in the Complaint, this defense is unlikely to succeed: a party's "[a]wareness of the fraudulent purpose [of a transaction] is inconsistent with the notion of good faith." *In re Candor Diamond Corp.*, 76 B.R. 342, 351 (Bankr. S.D.N.Y. 1987) (entering summary judgment in favor of trustee on actual fraudulent transfer claims). Regardless, it is premature for Gandhi to raise the defense at the motion to dismiss stage.

confirms the plausibility of the Trustee's tailored claims against Gandhi as a co-conspirator in the Bank Fraud.

For all of the foregoing reasons, the Trustee has plausibly alleged that the Debtors made the Gandhi Transfers with actual fraudulent intent to hinder, delay, or defraud their creditors. Gandhi's Motion to Dismiss should be denied.

## II.    The Complaint Plausibly Alleges that Gandhi was a Faithless Servant.

### A.    The Faithless Servant Claim Should Not Be Dismissed Because the Trustee States a Claim That Gandhi Acted as a Faithless Servant.

"The faithless servant doctrine applies where an individual 'owes a duty of fidelity to a principal and is faithless in the performance of services,' [and it] allows the principal to recover any commission or salary that it paid to the faithless servant." *Flaxer v. Gifford (In re Lehr Construction Corp.,* 528 B.R. 598, 607 (Bankr. S.D.N.Y. 2015), *aff'd* 666 Fed. Appx. 66 (2d Cir. 2016) (quoting *Phansalker v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 201-202 (2d Cir. 2003)).

Gandhi argues that he was not a faithless servant because his "employer"—in Gandhi's view, Modi—"knew of and tolerated his alleged behavior" and it was Modi who "orchestrated and directed the alleged scheme." (MTD, at 12.) Gandhi cites to *Phansalker v. Anderson Weinroth & Co.,* 344 F.3d 184 (2d Cir. 2003), which recognizes that "New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture." *Id.* at 201. The two standards describe faithlessness as "misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith," and "'misconduct and unfaithfulness [which] substantially violates the contract of service.'" *Id.* (*quoting Turner v. Konwenhoven*, 100 N.Y. 115, 120 (1885)).

The Complaint plausibly pleads facts meeting these standards. Gandhi's "misconduct . . . rises to the level of a breach of a duty of loyalty or good faith," and his "misconduct and

unfaithfulness . . . substantially violates the contract of service." *Id.* It is helpful to compare Gandhi's conduct to cases holding that a breach of loyalty was *not* substantial:  a breach of the duty of loyalty has only been found insubstantial "where the disloyalty consisted of a single act, or the employer knew of and tolerated the behavior.'" *Id.* at 202 (citing *Bravin v. Fashion Week, Inc.,* 342 N.Y.S.2d 971, 974 (1973)). In *Bravin,* the plaintiff-employee sued his former employer for severance pay, and the court held he was entitled to such pay, despite that former employer's claims of wrongdoing where "the plaintiff-employee was continued in his employment, while being compensated therefor, for at least 6 months after the earliest instance of conduct alleged to be either disloyal or insubordinate." 342 N.Y.S.2d at 974. The court in *Brevin* held that such continuance of employment was "an indication that the employer [ ] did not consider such conduct of so serious a nature as to violate the employment relationship" and that "the conduct complained of does not go to the very heart of the service contract of employment between the parties." *Id.*

Another case Gandhi cites (MTD, at 13), *Leary v. Al-Mubaraki,*  2019 WL 4805849 (S.D.N.Y. 2019), is distinguishable for the same reason. Similar to the facts in *Brevin,* the plaintiff-employee in *Leary* sued his former employer for wrongful termination, and his employer counterclaimed with the plaintiff-employee's own wrongful conduct. *Id.* at *4. The court in *Leary* held that the plaintiff-employee's acts of disloyalty were not "substantial" where defendant's "allegations indicate[d] that it 'knew of and tolerated the behavior' for several years before taking any corrective action," and defendant's "counterclaims d[id] not specify any occasion, other than his termination [ ], upon which [p]laintiff was disciplined for consuming alcohol while working." *Id.*

Here, the Trustee has adequately pled that Gandhi's misconduct "rises to the level of a breach of a duty of loyalty or good faith." *Phansalker,* 344 F.3d at 202. Gandhi was the CFO of the Debtors, served as one of Modi's co-conspirators, and orchestrated and oversaw millions in

fraudulent transfers in cash and inventory from the Debtors to overseas Shadow Entities and Firestar Entities over which Gandhi also exercised control, in furtherance of the Bank Fraud and to the detriment of the Debtors. (Complaint, at ¶¶ 13, 42, 52-61; 62-67, 69, 75-77; *id.* App. A-76; *id.* App. A-77; *id.* App. A-83.). Gandhi also (1) engaged in and oversaw suspicious accounting, corporate finance, and inventory practices, and engaged in efforts to manipulate and deceive auditors and lenders, for the purpose of furthering and concealing the Bank Fraud (*Id.* ¶¶ 78-97); (2) assisted in and participated in efforts to divert assets from the Bank Fraud and the Debtors for the benefit of Modi, his co-conspirators, and their families (*Id.* ¶¶ 98-135, 165-78); and (3) engaged in efforts to cover up and frustrate investigation of the Bank Fraud before and after the Debtors' bankruptcy filing. (*Id.* ¶¶ 136-64.) Unlike the facts in *Brevin* and *Leary,* there is no question of whether Gandhi's breach was "substantial." Rather, his orchestration of the "systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities . . . in combination with the fraudulent omissions and misrepresentations Gandhi and Bhansali made in the context of these chapter 11 cases, constituted millions of dollars in actual fraudulent transfers and impaired the recovery of loan receivables of the Debtors and the U.S. Affiliates." (*Id.* ¶ 178.).

In any event, Modi was not Gandhi's employer. The "employers" or "principals" for purposes of the Trustee's faithless servant claim are the Debtors. Moreover, Gandhi pretends that he had no control over his own actions in asserting that "Gandhi was part of an alleged conspiracy with his boss, Mr. Modi, who, it is alleged, orchestrated and directed the alleged scheme" (MTD, at 12.) Gandhi was the CFO of the Debtors, not a lower level employee just following the orders of his boss. In any event, Modi's own breach of fiduciary duty does nothing to excuse Gandhi from his own independent duties. A wrongdoing agent cannot rely on concurrent misdeeds of other agents as a shield to his own misconduct. *See Brown v. Poritzky,* 30 N.Y.2d 289, 294 (1972), *overruled on other grounds by Lusenskas v. Aexelroad*, 81 N.Y.2d 300 (1993) ("Sound policy dictates

that a special agent who breaches a duty owed to his principal should not be insulated from liability by the fortuitous happenstance of a general agent's concurrent negligence …. [A] principal should not be remediless against two negligent agents"). Accordingly, the Trustee plausibly states a faithless servant claim.

### B.    The In Pari Delicto Doctrine Does Not Apply to the Faithless Servant Claim.

Gandhi responds that the *in pari delicto* doctrine bars the Trustee's faithless servant claim. (MTD, at 13-14.) This doctrine provides that courts will "not mediate" disputes "between two wrongdoers" who bear "equal or mutual fault" for the legal wrongs alleged. *In re KDI Holdings, Inc.*, 277 B.R. 493, 517-18 (Bankr. S.D.N.Y. 1999). Because of the requirement of equal or mutual fault, courts have held that the doctrine is squarely inapplicable "where a cause of action is brought against an insider" who "dominat[ed] or control[ed]" the corporation. *Id.* at 518-19. In that circumstance, the controlling insider bears greater fault than the corporation for the wrongful conduct and so the *in pari delicto* defense is unavailable. *Id.*; *accord Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir.1993) ("The *in pari delicto* defense does not apply [where an insider] forced the corporation to act for the benefit of the [insider] through domination and control"); *Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006).

In fact, "it would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation" to raise an *in pari delicto* defense. *In re Platinum-Beechwood Litig.*, 2019 WL 2569653, at *7 (S.D.N.Y. June 21, 2019) (finding that *in pari delicto* doctrine did not bar joint liquidators' claims against *alter ego* insiders of corporation). Individuals "on board or in management positions" are "model insiders." *Flaxer*, 528 B.R. at 613; *accord Flaxer*, 666 F. App'x at 69 (*in pari delicto* is inapplicable "to actions of fiduciaries who are insiders in the sense that they are either on the board or in management, *or in some other way control the corporation*") (emphasis in original); *Picard v. Madoff*, 458 B.R. 87, 123-24 (Bankr. S.D.N.Y. 2011).

Here, the Trustee has pled that Modi, Gandhi, and Bhansali all controlled the Debtors through their status as insiders, directors, and/or officers (*see* Complaint, at ¶¶ 12-14, 52-56), and so their fraudulent activities do not give rise to an *in pari delicto* defense. *Kalb, Voorhis*, 8 F.3d at 133; *Flaxer*, 666 F. App'x at 69. Specifically as to Gandhi, the Trustee has alleged that his fraudulent conduct as CFO misappropriating the Debtors' assets and committing actual fraud against the Debtors' creditors including PNB directly injured the Debtors. (Complaint, at ¶¶ 58, 62-63, 66-67, 69, 75-81, 83-91, 93-94, 96, 110-13, 136-38, 149-53, 160-63, 165-78; *id.* App. A-76; *id.* App. A-77; *id.* App. A-83; *id.* App. A-96; *id.* App. A-97.) Therefore, due to Gandhi's "domination and control" over the Debtors and his ability to misappropriate the Debtors' property, the Debtors and Gandhi are not at "equal fault" for the wrongs alleged in the Complaint, as required for the *in pari delicto* defense.

It is also no defense, as Gandhi asserts, that he conspired with Modi to commit fraudulent acts. (MTD, at 13-14.) Gandhi was the Debtors' CFO with corporate authority to resist Modi's demands, as well as a duty to act in the Debtors' best interests. (Complaint, at ¶ 13.) Even though Gandhi asserts he was only the Debtors' "nominal" CFO—whatever that means—he offers no reason to conclude that he did not have the duty and power to act in the Debtors' best interests, rather than conduct the Bank Fraud in concert with Modi to the Debtors' detriment. (MTD, at 13.) *In pari delicto* has no application here.

For these reasons, the Court should deny Gandhi's request to dismiss the Trustee's faithless servant claim.[4]

---

[4] Unlike Bhansali, Gandhi does not argue that the statute of limitations has run on the faithless servant claim. Regardless, the faithless servant claim is timely for the reasons given in the Trustee's opposition to Bhansali's motion to dismiss, filed contemporaneously with this Opposition.

**III.     The Complaint Should Not Be Dismissed As Duplicative or on Claim Splitting Grounds.**

Finally, Gandhi argues that the Court should dismiss the Complaint because it functions as an amendment of the complaint in the Fiduciary Duty Action without leave of the Court. (MTD, at 7-8.) This argument fails on the merits and is grounded in a claim of prejudice that is a red herring.

Gandhi cites no authority for the proposition that a court will construe a new complaint in a new lawsuit as an improper attempt to amend a prior complaint without leave of court. The cases Gandhi cites only discuss the traditional analysis for whether a plaintiff can amend a pleading under Federal Rule of Civil Procedure 15. *See, e.g., Picard v. Estate of Mendelow (In re Bernard L. Madoff Inv. Sec. LLC)*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) (granting leave to amend); *In re Smith*, 204 B.R. 358 (Bankr. E.D.N.Y. 1997) (same). These cases have no bearing on whether the Complaint should be dismissed because of its purported similarities to the Fiduciary Duty Action.

Regardless, the court in *Picard* granted a trustee leave to amend a complaint five years into the litigation and after the parties conducted substantial discovery and engaged in briefing on a motion to dismiss. 560 B.R. at 221. The *Picard* court cited the general policy favoring amendments "because they tend to facilitate a proper decision on the merits." *Id*. So too here. The interest in resolving the Trustee's claims on the merits outweighs any concerns that the Complaint shares any commonalities with the Fiduciary Duty Action or has caused Gandhi prejudice, as he alleges, since these suits are not duplicative and remain in preliminary procedural postures.

Second Circuit caselaw agrees. The Second Circuit has recognized only limited circumstances in which a second lawsuit can be dismissed as duplicative of a prior lawsuit: "there must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts,

27

and the title, or essential basis, of the relief sought must be the same." *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019). Put differently, a court "must be careful, when dismissing a second suit between the same parties as duplicative, not to be swayed by a rough resemblance between the two suits without assuring itself that . . . *the claims* asserted in both suits are also the *same*." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 136 (2d Cir. 2000) (emphasis added); *accord Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1463 (2d Cir. 1996)) ("[T]he fact that the first and second suits involved the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct is not dispositive"); *McNellis v. First Fed. Sav. & Loan Ass'n of Rochester, N.Y.*, 364 F.2d 251, 255-56 (2d Cir. 1966). Rather, a second lawsuit may be dismissed for duplicating a prior lawsuit only when it "requires the same evidence to support it" as the prior lawsuit. *Maharaj*, 128 F.3d at 97.

Accordingly, even when the claims in successive lawsuits are similar to one another and arise from related factual predicates, courts consistently refuse to dismiss a later-filed suit when the plaintiff must, to prevail in both suits, submit different proof. *See Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91-92 (2d Cir. 1997) (no claim splitting with respect to successive litigation involving "parallel but distinct transactions" giving rise to "separate statutory wrongs"); *accord Sacerdote*, 939 F.3d at 505-07; *Maharaj*, 128 F.3d at 97-98; *Nestor v. Pratt & Whitney*, 466 F.3d 65, 72-74 (2d Cir. 2006); *Curtis*, 226 F.3d at 136; *First Jersey Sec.*, 101 F.3d at 1463-64; *Sterling v. Deutsche Bank Nat'l Tr. Co. as Tr. for Femit Tr. 2006-FF6*, 2019 WL 5722320, at *5 (S.D.N.Y. Aug. 16, 2019); *Sec. & Exch. Comm'n v. Thompson*, 238 F. Supp. 3d 575, 593 (S.D.N.Y. 2017); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 2011 WL 3847376, at *5-6 (S.D.N.Y. Aug. 30, 2011); *Shamrock Assocs. v. Sloane*, 738 F. Supp. 109, 117 (S.D.N.Y. 1990); *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 291-92 (Bankr. S.D.N.Y. 2018); *In re Cohoes Indus. Terminal*, Inc., 69 B.R. 717, 722 (Bankr. S.D.N.Y. 1987).

This rule precludes dismissal of the Complaint based upon its purported relationship to the Fiduciary Duty Action. The Bank Fraud, of course, underlies both the Complaint and the Fiduciary Duty Action. But the Bank Fraud will underlie *any and every* adversary proceeding commenced in the Debtors' chapter 11 cases, because the Bank Fraud is a but for cause of these chapter 11 cases. Instead, what is critical is that, in order for the Trustee to prevail on the actual fraudulent transfer and faithless servant claims here, the Trustee has to prove elements that are not required in, and are indeed irrelevant to, the Fiduciary Duty Action.

Here, the Trustee has to prove the following elements on the fraudulent transfer claims: (1) the Debtors transferred interests of the Debtors in property to or for the benefit of Gandhi; (2) the Debtors made the transfers within the relevant lookback period; and (3) the Debtors made the transfers with the actual intent to hinder, delay, or defraud the Debtors' creditors. (Complaint, at ¶¶ 213-38.) As to the faithless servant claim, the Trustee has to show: (1) Gandhi acted faithlessly with respect to his duties to the Debtors by participating in the Bank Fraud; (2) Gandhi did so intentionally, maliciously, and/or with wanton and willful disregard for the Debtors' rights and interests; (3) the Debtors paid compensation to Gandhi in the expectation that he would discharge his duties faithfully; and (4) the Trustee is entitled to disgorgement of Gandhi's compensation. (*Id.* ¶¶ 239-47.) Importantly, for both of these claims, the Trustee's success turns on identifying transfers made by the Debtors to Gandhi that now can be avoided and recovered (because they were made with actual fraudulent intent) or disgorged (because Gandhi is no longer entitled to compensation for the faithless performance of his duties to the debtors).

The existence of transfers from the Debtors to Gandhi is entirely irrelevant to the Fiduciary Duty Action. Instead, that action is concerned solely with Gandhi's conduct breaching his duties of care and loyalty to the Debtors. (*See Levin v. Modi, et al.*, No. 19-1102, Dkt. 28, at ¶¶ 208-11.) The Trustee in the Fiduciary Duty Action is not required to submit any evidence concerning any

29

actions or transfers that the Debtors took or approved. It is therefore not the case that "the same evidence is needed to support both" the Fiduciary Duty Action and the Complaint, and so there is no basis to dismiss the Complaint on claims splitting grounds. *Fairfield Sentry*, 596 B.R. at 291; *accord Maharaj*, 128 F.3d at 97; *Sacerdote*, 939 F.3d at 504.

In addition, when courts have dismissed successive litigation on claims splitting grounds, they have done so when the plaintiff commenced the second lawsuit *after* the court dismissed the previous action with prejudice or entered a final judgment in that action, or *after* the plaintiff missed a deadline in a scheduling order to add parties or claims. *See, e.g., AmBase Corp. v. City Investing Co. Liq. Tr.*, 326 F.3d 63 (2d Cir. 2003) (affirming claims splitting dismissal where related action was previously dismissed with prejudice); *Waldman v. Village of Kiryas Joel*, 207 F.3d 105 (2d Cir. 2000) (same); *Reininger v. N.Y.C. Transit Auth.*, 2016 WL 10566629 (S.D.N.Y. Dec. 22, 2016) (same); *see also Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 49 (2d Cir. 2013) (affirming dismissal of successive litigation that was brought in attempt to evade deadlines in scheduling order); *DiGennaro v. Whitehair*, 467 F. App'x 42 (2d Cir. 2012) (same); *DiGennaro v. Whitehair*, 2010 WL 4116741, at *4 (W.D.N.Y. Oct. 19, 2010).

Here, by contrast, the Fiduciary Duty Action remains in a preliminary procedural posture. Gandhi's motion to dismiss that adversary proceeding is pending, there is no scheduling order setting a deadline to add claims or parties, discovery has not commenced, and, of course, the Court has not entered judgment. Because the Court has not adjudicated any of the parties' claims in the Fiduciary Duty Action, much less progressed beyond the earliest stage in the litigation, there exists an additional basis not to dismiss the Complaint on claims splitting grounds. *See Schmieder v. Hall*, 545 F.2d 768, 771 (2d Cir. 1976) (noting that *res judicata* and claims preclusion

principles are meant to bring "peace" to parties that have been engaged in long-running, not

nascent, litigation).[5]

Even if the Court were to accept Gandhi's argument that the Trustee impermissibly split

claims between the Fiduciary Duty Action and the Complaint, dismissal is still not required. The

Second Circuit has stated that "a court faced with a duplicative suit will commonly stay the

second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or *consolidate*

*the two actions.*" *Curtis*, 226 F.3d at 138 (emphasis added); *accord Devlin v. Trans. Comm'cns Int'l*

*Union*, 175 F.3d 121, 129-30 (2d Cir. 1999) (consolidation appropriate where "the same district

judge had both [suits] on his active docket at the same time"); *Coleman v. B.G. Sulzle, Inc.*, 402 F.

Supp. 2d 403, 421 (N.D.N.Y. 2005) (consolidating duplicative actions in the interest of "judicial

economy"); Fed. R. Civ. P. 42(a)(2) (permitting the consolidation of multiple actions involving a

common question of law or fact). Accordingly, the Court is not required to dismiss duplicative

litigation as Gandhi suggests. It may instead consolidate proceedings on the Complaint and the

Fiduciary Duty Action if it determines that the suits are duplicative or otherwise share any

common question that should be resolved in a single proceeding.

Gandhi's only response is that he has purportedly suffered prejudice in responding to the

Trustee's Complaint, and that the Complaint should be dismissed as a sanction. (MTD, at 7-8.)

This is a red herring. Gandhi suggests that the Trustee should have instead sought leave to amend

the complaint in the Fiduciary Duty Action to assert the claims the Trustee brought here. But if

the Trustee did move for leave to amend, it is inevitable that Gandhi would have filed an objection

---

[5] For these reasons, Gandhi is wrong to suggest that the Trustee has "repackage[ed]" duplicative claims in this adversary proceeding and engaged in "shenanigans" in bad faith. (MTD, at 5.) Instead, the Trustee has faithfully discharged his duties to the Debtors' estates to bring meritorious claims against the wrongdoers who destroyed the Debtors' businesses and harmed the Debtors' creditors through their fraudulent conduct.

and argued that the Trustee's proposed amendment came too late and was futile. The arguments Gandhi would make in that objection would duplicate the arguments that Gandhi has made here when seeking dismissal of the Complaint. As a result, Gandhi has suffered no prejudice (even assuming that the payment of attorneys' fees in the ordinary course of litigation can constitute prejudice) that Gandhi would not have otherwise encountered if the Trustee moved to amend the complaint in the Fiduciary Duty Action, as Gandhi suggests.

Moreover, this complex litigation arises out of Gandhi's complicity in a decade-long, multi-billion dollar fraud scheme that decimated the Debtors' businesses, impaired the claims of the Debtors' creditors, and caused the Debtors to file for bankruptcy and terminate all of their employees. Against the backdrop of the significant harm that Gandhi has caused to the Debtors, their estates, and innumerable other innocent individuals, and taking into account the strength of the Trustee's claims against Gandhi, the allegations that he has unduly suffered because of the Trustee's litigation, and that he is a victim, ring hollow.

## CONCLUSION

For reasons set forth in this Opposition, the Trustee respectfully requests the Court deny Defendant Ajay Gandhi's Motion to Dismiss in its entirety.

Dated: June 26, 2020
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By:   */s/ Richard Levin*
Richard Levin
Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
rlevin@jenner.com
cwedoff@jenner.com

Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

*Counsel for the Chapter 11 Trustee*